One of the cases will be submitted later today without oral arguments on the basis of the briefs. That is Appeal 3318 from 2008, Gowing v. Merit System Protection Board. On our argument panel, we'll hear argument first in Appeal 1201 from 2008, Ninestar Technology v. International Trade Commission. Mr. O'Connor, good morning to you, sir. Good morning. Welcome back to the court. Thank you. It's a pleasure to be with you. Please proceed. I'm pleased to report I've been here before, and we have questions. If I could ask your indulgence for just one brief second to make a point that I think should be made clear, and I think it has been. There has been statements made in all the briefs by the Commission and by the Administrative Law Judge that the purpose of a particular geometric arrangement of contact points in the 917 patent is to prevent the spring contact from sliding off the points. And to support that, on page 11 of the Epson brief, they have some rather elaborate drawings on there. You will not find those drawings anywhere in the patent, and at least I have not been able to encounter any reference in the 917 patent or the 902 patent to the role of contacts performing any function, much less the function of preventing contact points from slipping. So I think that's important because it's not an invented feature of this patent. The misrepresentation is material that has been made throughout, and it's wrong. On page 36 of our brief, we've reproduced the testimony of Epson's expert, and he was asked about that with regard to doctrinal equivalence. And he was asked by Epson's lawyers. So these conductive patterns, that's the key here. Do you have an opinion as to whether that claim limitation could nonetheless be found in the conductive patterns? Answer, I find in the doctrinal equivalence, the same function is exercised. Judge Lucerne, what is the function? There's their witness. The function is to establish a contact between the semiconductor and the contact-forming member in the printer carriage. Nowhere does it say that the purpose is to prevent contacts from sliding off of contacts. What is your proposed construction of contacts? The contacts are the discrete portions of conductive material contained on the cartridge, period. And then it goes on to say they're arranged in, I'm sorry. And you agree that it's two contacts in these two rows? Not what, only in the claim specifically say that. So that's a specific claim limitation that's written. But it's not necessarily part of the definition of contacts. If contacts, then you have the arrangement of the contacts. All right? So that was the main point I wanted to make. I'll go on, unless I assume you want to go to the questions. Okay. Another misrepresentation, I think, of this material is in the government's brief. And the government specifically says that the commission determined it would not consider certain patents because they were not a record. And they're listed. They list them on page 46 of their brief. And they list the 660, the 824, and the 678 patents. But if you look at the commission's decision, the commission didn't reference those patents at all. On page 43, the commission says, references the 507 patent, the 040 patent, and the 115 patent. So I don't know why the government made that representation. But then they go on to say that this court can ignore the patents that they've listed. And this court can't ignore those patents. They were a record. And the commission never excluded those particular patents that they referenced. So those, I thought, were two important just basic misrepresentations that are contained in this record and are relevant. The case I think is probably most important in terms of the recent case was this court's decision in the Sundance case. And that didn't change anything. But I like the court's analogy. It's a piece of a puzzle. Where they talk about that you can't basically go out and take a piece from here, a piece from there, a piece from there, put them all together, and say, now I have an invention. And essentially they say that is a prima facie case of obviousness. I don't know why this court would have to go to that. When I first started writing patent applications in 1969, they told us about the pencil and the eraser. You know, the pencil performs a function, the eraser performs a function. When you stick the two together, you can't get a patent because they still perform the same function in the same way. It's clear to me from the prior art, this goes to the obviousness, from the prior art that was referenced in the briefs and in the argument before the commission, that every single claim element that is set forth in the claim to the issue are all found in the prior art. There's nothing not here. What they've done, particularly to take the 503 patent, they took the 422, which was an Epson product and an Epson patent and a commercial environment, and they simply moved the port. They moved it from one side slanted to the other side. This is an invention. Well, in the first place, there's a prior art which specifically says moving the port to prevent. There are several obviousness issues. Are you talking about the 053 patent? Yes, I am. And then you're talking about that vis-a-vis the 422. Right, and the confusion there is the 422 is also an issue, but the 422 is also prior art to the 053. Right, right. That's the 053 and the 422 is an important issue. That's right, exactly. So, like I said, there's prior art, and specifically there is even a specific reference in the 695 patent, which for some reason was not argued in the brief, but it is part of the record, which shows the same drawing of the 184 patent, but says that it expressly says that you can move the port further away from the contact to prevent any stowage. So that's cleanly and expressly taught in the prior art. That's not a novel invention, but it's already right there. But what they did was they took the 422. When you say they, who are you referring to? Epson. Epson. And Epson's is backwards. So, and that's also confusing because they're called SECO, but the SECO of Epson is a SECO. The port in the 422 patent is closer to the contacts. So the supposed invention in the 053 patent was to move that slightly away. Well, common sense tells you that that was not a problem to be solved because the 422 is a commercial embodiment. So if they were making and selling that commercial embodiment, the preferred embodiment, they wouldn't be doing that if they were splashing ink. That was just an arbitrary move, and then they tried to patent it, just as they tried to patent the arrangement of contacts, though so purposely, which is to enable them to make with a printer. These are minor design changes that are made for commercial reasons. They have nothing to do with invention or novelty, but they've been using this technique to basically keep one step ahead of the competition, and I think that the JSR case hopefully put an end to that practice. So that's on the obviousness. On the infringement, we have this rather bizarre claim interpretation by the commission, which was a claim interpretation nobody requested, and they have this definition that they're pieces of conductive material with discrete portions. Now, there's no definition of discrete portions, so that's a classic example of an indefiniteness in a claim, and they knew that was a problem, so then they come in and they say, well, but that's okay, because even if it doesn't infringe that way, it infringes under the doctrine of equivalence. Well, I've tried lots of jury trials and patent infringement cases, and what do you do? You give the jury an interrogatory, a series, and it's a flowchart, and it says, do you find literal infringement? If yes, then you go and find damages. If no, then is there infringement under the doctrine of equivalence? I've never seen a jury question that said if you find literal, then you also can find equivalence. You can't do both. Why? Because equivalence has a prerequisite that a literal claim element is missing. So here, it was the contact includes the leads? No, that would be... It does not include. So what does it include? It consists of not all conductive material? Well, first of all, there's no leads in this pattern. That was another bizarre, you know, out in the weeds where this commission went. They talk about, if I just digress for a second, they talk about leads as connecting sensitive contacts, but if you look at the specification, those leads do not connect the contact. They're simply extended portions. They extend out from the contact itself, and then they talk about an inch goes across it, you'll have a short, and that's what they're talking about. There are no leads that connect patents. It does not include that, despite what the commission said. The commission did not read this pattern as carefully. So the contact material that's disclosed in the patent, there's nothing about discrete portions of anything in the patent. It just says these are pieces of conductive material. And the patent's claims, they did what I always tell patent lawyers not to do. They simply took the preferred embodiment, described it verbally, and said those are our claims, without any regard to whether those claims perform any particular function whatsoever. If they had polka dots on those things, they would put polka dots on the claims. The contact portions are clearly defined. Just look at it. You don't have to go through these mental gymnastics to come up with something. It's the discrete portions of conductive material designed for the purpose of meeting with discrete contacts in a printer. You don't have to become complicated. Is there a rebuttal time? I do. Thank you. Mr. Harrington. Thank you. Thank you, Your Honor.  I've listened to Mr. O'Connor's argument. I've read his court law brief. I'm puzzled about some of the arguments that he's made to you this morning. They're certainly incorrect. One of them has to do with whether or not the commission considered the additional paths that we referred to. Well, when you treat his first argument, I think that was the second. And his first had to do with the purpose of the event. Do you recall the argument he made? No. I don't recall that argument. I don't know. I'm sorry. Mr. Barza, he probably wrote that down. But I was concerned about his representation about what our agency did. Our agency, the commission, did not consider those additional references, the additional references that we referred to in our brief, and upon which he has based his arguments here today. And the reason why we didn't consider those references is because they had, first of all, because they had not been brought before the administrative law judge. If you look at the post-hearing brief that they filed, the only references that they argued to the administrative law judge were the references that the administrative law judge referred to, not these other references, as we point out in our brief. So the administrative law judge didn't consider these. He wasn't asked to consider these. When we examined the administrative law judge's initial determination and determined to review that and gave 9STAR an opportunity to argue that perhaps the record should be reopened in view of KSR, they attempted to argue these other references, but we held that, number one, they hadn't been brought before the ALJ, and second, KSR really didn't provide a rationale for arguing. Did you offer an opportunity for the record to be reopened back in front of the administrative law judge? Well, what we did was, in our notice of review, Your Honor, was to indicate to the parties that they could present argument to us as to whether KSR... Was meeting the commission. Meeting the commission as to whether the record should be reopened or not in view of KSR. And what did they do? The commission decided, oh, you mean 9STAR? Yes. Okay, 9STAR... That they asked for it to be reopened. Well, what they did was to simply argue these new references. They didn't provide a rationale for reopening the record. At least, if they did, it wasn't a rationale that was satisfactory to us. And they haven't made that argument here, Your Honor, as to the commission having made an error in that regard. So what happened here is that they attempted to argue new references before the commission. We held that they had not provided sufficient reason to do so, that these references could have been provided and argued to the administrative law judge when the case was before him because KSR didn't change the relevance of those particular references, and they didn't argue that they did. So we determined that the record didn't need to be reopened. Do you have other points you want to get to? You've used up half your time. Yes, Your Honor. Attorney, let me ask you, where do you say there's substantial evidence? I'm looking for help on this. The two rows of contacts in the case sheet that you have and the claims that are issued with the 917 patent. Yes, Your Honor. And I guess claim one of the 902 patent. And I'm looking at page—I guess it's page 5090 and 5096 of the joint appendix. Okay? Now, correct me if I'm wrong, but that seems to be—that's in volume 406. That—and you'll correct me if I'm wrong—that seems to be the representative accused devices. And what I'm looking for, where do you get the two rows in what's the 5090 and what's the 5096? Yes, I see that, Your Honor. The two rows are formed by the widened portions. If you look at the widened portions of the so-called serpentine pattern, the widened portions correspond to the contacts and the commission's definition of contacts. So if you look at the widened portions, you will see that you have rows. Now, you're talking—I guess one of 5096 is the clearest. Say there you have—how many widened portions up at the top? Well, I see at least two. Okay. And I see that—down below, I see at least three. Now, what is the evidence? Is there expert testimony or something that says this? There actually is one. I'll just refer you to that. This was—yes. It is at A10820 to 10820 to 10821. And that is expert testimony to the effect that a discernible row structure can be detected even under the nine-star definition, which, by the way, is very similar to our definition. I was rather surprised to hear Mr. O'Connor say otherwise. And let me just address one other point, and this has to do with the attempt by Nine Star to make an argument having to do with the limitation that they've actually weighed. This has—I'm speaking particularly of the so-called chamber of housing limitations, which they argue at pages 38 and 40 of their brief. They did not raise this argument in their petition for review. They have therefore weighed it. They have argued the Intel case as stating that via the footnote they could have incorporated this by reference. The Intel case is a case where we effectively weighed our rule. There was an effective petition for review there, one which incorporated a large number of documents by reference. Our rule provides that if you don't particularly raise an issue, we don't have to consider it. But in that case, we did consider it. All right, time is expiring. Thank you very much. Thank you. Of course, we've got the briefing of the parties. We need to summarize what's in the briefs. I think you can probably help us best if you can pinpoint some responses to Mr. O'Connor's arguments here today. Yes, Your Honor, I will do that. May it please the Court, my name is Cal Barzan. I represent the interveners, the absent entities. Mr. O'Connor suggested that the specification does not disclose this invention or these embedded aspects. I believe it does. And while I wish it did so directly as stated in the briefing, I think it's clear that once filled in the art, the explanation is more than sufficient. Directing the Court to the specification of Appendix A00-119, Column 1, Lines 66 and 67, through the following column, Column 2, Line 12, there's a description of the problem. First of all, there's a problem in contact with the semiconductor. Which line is this? I'm sorry. No, no. This is the spec, common specifications, the 917 and the 902. Okay, 917. What were you looking for in Column 2? Column 1, bottom of Column 1 and top of Column 2. It says, however, there is a problem in contact with the semiconductor storage. It's failed. And by the way, this is a translated spec from Japanese, which is why it's a little rough. It's failed because of rough operation for attaching or detaching a cartridge by a user or play between a cartridge and an ink cartridge. The reading of data is disabled. So the specification identifies that there is a problem that conduction is lost between the cartridge and the printer, either when you're putting the cartridge in or when it's moving around. It then goes on to solve the problem. Now, first of all, the claims themselves were originally filed with the specification, and they disclosed the solution. But it is clear, if you look at the spec as a whole, that the inventors understood that the location of the contacts being near the port, et cetera, et cetera, et cetera, resolved the problem. So, for example, I'll give a few examples. On column six, lines 57 through 64, there's a description of the fact that further as shown in figure 689, the circuit board 31, the ink supply port 54, 44, 54, and the overhang numbers are located on the same side of the ink cartridge. Owing to such structure, the position of the circuit board with respect to the contact numbers of the printing apparatus is not largely affected by the quantity of a turn when the ink cartridge 40 is mounted on the holder of the printing apparatus. So they're explaining right there that the arrangement of the contacts being right near the port, which is the place, the focal of movement, and being arranged in this way reduces the effect of the turn of the ink cartridge but would otherwise cause the contact of the cartridge to lose conduction, I'm sorry, the contact of the cartridge to lose contact with the cartridge. Point taken. Let me just turn to one of Mr. O'Connor's arguments. He said that it's obvious that the point of that being different from the difference of the fact that there's a position of the ink supply port. Why is that invented? It's invented because the 422 pad, first of all, the 053 also puts the circuit board on the projected portion far away, the exact opposite side from the port. The 422 put together a lever, a port that goes on the needle, and the contacts so as to lock them together and reduce the risk they would come apart. The 053 does exactly the opposite, and it has a lever here and a port here, but it puts the contacts on exactly the opposite side, which is exactly the opposite of what the 422 teaches. And it does that to prevent contamination from ink leaking out of the ink supply port. So it's a substantial difference, and in fact is directly taken away from by the prior reference. If I may, there's a question. I'd like to ask you the same question I addressed to Mr. Harrington. The two rows of contacts limitation that we have in each of the facts at issue, he directed our attention to 10,820 for 10,821, but do you have anything to offer on that? Are you saying that once you do the circuit, we're looking? Yeah. Where do you see the two rows? I see that there are... I guess what I have in front of me is I've got... I understand. I looked at the pictures, Your Honor. I believe our brief shows them more clearly. There's a point I want to make about... You've got the green brief, right? Yes. And if you look at page 36, I think there's a better picture, and our expert actually annotated it with... Page 36 of your brief? Yes, Your Honor. I'm running out of time. No, I see what you've got there, and I understand what the argument is. It's the parts that bulge out. Yeah, they're wide, and they look like they were designed to make contact with something. My only question is, is there anything... Is there support for that that Mr. Harrington cited? 10,820 through 821. I want to... And I believe Dr. Murch made the same point again slightly later in his testimony. He said in response to direct questions, yes, just looking at this, I can tell what portion is the contact because of its shape and size. However, I believe, and I'd like to submit to this Court, that the better point of construction was that of Judge Luckard, the ALJ of this case. He construed the claims to mean the portion of the conductive material that touches the printer. And I submit to you that to one skilled in the art, that's how this invention would be interpreted. This Court has said repeatedly that you find claim construction from the eyes of one skilled in the art. Are there other points you need to reach because you're down to 45 seconds? Yes, Your Honor. I believe that there is no prior art reference that has the fourth limitation of the 917 patent. There is no prior art... 635 does not show an in-supply port. The inventive feature of the 917 patent, the fourth limitation, is a combination of elements. It puts together a set of contact patterns, but it puts it over an in-supply port. And the reason for that is because the in-supply port causes motion, and the contact arrangement minimizes the effects of that motion. So this is an inventive and unique limitation that solves a unique problem to cartridges that have an in-supply port. The 635 does not have that problem. It doesn't have that limitation. They basically reconstructed or rewritten the prior art reference. All right. Thank you very much. Let me ask you to get up there. What is your response to the question that I asked Mr. Harrington and Mr. Garza about dual contacts limitation? They said, you look at these pictures that are in the appendix here and the testimony that was cited, and that testimony says that it's where there's a bulge out. And it's on that basis that the expert discerns two rows. What is your response to that? Why is that not substantial evidence under, say, the commission's construction? Well, because the commission's construction is that there are rows of it, that there are conductive material with discernible patterns or something within it. There's nothing in the specification which indicates that that is not a lawful claim interpretation. The claim specification is very clear. They're discrete conductive materials, not something in the conductive material. And the only way that they can—if you just take the claim limitation, how do you determine objectively, without regard to an accused product, what is a discrete portion of conductive material which meets the limitation? Any place where there's a bulge— But accepting the commission's construction, which I understand you challenged, nevertheless, under that construction, why does the testimony to which I was directed not provide substantial evidence? Because there's nothing in the construction which defines those areas. Any place along those—they're pretty wide all the way down. You can have context, depending upon what kind of a printer you're using, which gets back to this argument that what they're really doing is making this depend on the actual printer. If you just look at those things, there's the way you're reading them, the lines all over the place, there's nothing in there which relates to any kind of particular pattern of conductive material other than in conjunction with any particular printer. And that's not the limitation that was put in there. In fact, there was a specific limitation that they said they weren't putting in there. I want to address them real fast if I can. With regard to Mr. Barr's assertions that the patent teaches, somehow impliedly teaches, that these patterns serve that function of keeping and maintaining the contact points. First of all, in Column 2, it says that the object is to permit an ink-printing apparatus when data stored in semiconductor storage means can be prevented from being lost independent of unsuitable operation for attaching or detaching any cartridge. Then they go over on Paragraph 6 and 7, in particular 7, to talk about any problem concerning maintaining contact. Paragraph, you mean Column 6? I'm sorry, Column 7. Column 7. It is established by this Lever 11, which presses down, it has elastic material. That's what this patent is all about. This squeezes down, latches on, and holds these cartridges in place. There's almost no room for these things to move anywhere. They can't move up and down because they're pressed down by the lever. And they can't move side to side because they're in a box. And specifically addressing that, Column 7 refers to Figure 10. And here's what the patent says. It says, even if the cartridge 40 rattles when it is installed, and a turn is caused when the ink supply needle sits in the center, the quantity A of a turn, and that's alpha shown in Figure 10, is extremely small as shown in Figure 10. They go down further on lines 31 on Column 7. The contact forming members 29 and 29 prime elastically come in contact with the contact 60 of the circuit board 31 in a state in which the ink cartridge 40 is securely installed. On Column 8, they say, as shown in Figure 14, if elastic members 108 and 109 are laid approximately in the center of the bottom of the holder for airtight capability, that's what they were concerned about. Airtight capability between the ink supply board and the ink supply needle can be maintained independent of vibration and shock. There's nothing in this patent that has anything to do with those arrangement of rows of the contacts. That's not even discussed anywhere in here in terms of functionality. So it can't be invented if it doesn't have a function. So that's the purpose of that, and I did want to address that. Teaching away from what I just read. It teaches away from the concept that the rows and contacts have anything to do with functionality. The moving the port away from the ink port is not taught. There's no teaching away. Teaching away says this is not necessary because, or don't do this because. Simply because a preferred abiding shows one arrangement doesn't mean to teach it away from all other arrangements. All right. Thank you, sir. Thank you. Thank all three of you. We'll take the appeal under advisement.